FILED

AUG 07 2026

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY [signature] DEP CLK

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

**RALEIGH DIVISION**

No. 5:26-cv-00555-M

| | | |
|---|---|---|
| CRISELDA ANGELA BELL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | PETITION TO VACATE |
| | ) | ARBITRATION AWARD |
| CISCO SYSTEMS, INC., | ) | PURSUANT TO 9 U.S.C. § 10 |
| | ) | |
| Respondent. | ) | |

Petitioner Criselda Angela Bell, proceeding pro se, respectfully petitions this Court to vacate the arbitration award entered against her, and states as follows:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), as Petitioner is a citizen of North Carolina and Respondent Cisco Systems, Inc. is a citizen of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Venue is proper in this District under 28 U.S.C. § 1391(b), as Petitioner resides in Wake County, North Carolina, within this District, and a substantial part of the events giving

rise to the underlying dispute occurred at Respondent's facility in Morrisville, North Carolina, also within this District.

3. This Petition is brought pursuant to Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10(a)(4).

## PRELIMINARY STATEMENT

4. Petitioner does not ask this Court to reweigh the evidence underlying the Arbitrator's decision or to substitute its judgment for the Arbitrator's factual findings. Petitioner seeks vacatur on three independent but interrelated grounds. First, under 9 U.S.C. § 10(a)(4), the Arbitrator exceeded her contractual authority by applying the legal standard governing equitable estoppel — requiring proof of "deliberate design" by Respondent — to an argument Petitioner actually raised under the analytically distinct doctrine of equitable tolling based on a claimant's inability to discover the factual basis of her claim. Applying the wrong legal standard to a properly raised argument, where the correct standard was controlling and squarely applicable, exceeds the Arbitrator's authority under the parties' agreement to apply "applicable substantive law. Second, under the manifest disregard doctrine recognized by the Fourth Circuit as either an independent ground or a judicial gloss on 9 U.S.C. § 10(a)(4), *see Raymond James Fin. Servs., Inc. v. Bishop*, 596 F.3d 183, 193 n.13 (4th Cir. 2010), the Arbitrator consciously disregarded the well-defined discovery-rule tolling standard by substituting the deliberate-design framework and declaring no amount of discovery could affect the timeliness outcome — effectively treating the 180-day window as an absolute bar impervious to equitable relief. Third, under 9 U.S.C. § 10(a)(3), the Arbitrator's pre-discovery dismissal constituted a refusal to hear evidence pertinent and material to the controversy — specifically, evidence bearing on when Petitioner could reasonably have

discovered the factual basis of her claims — resulting in a denial of a full and fair hearing. Each ground independently warrants vacatur. Together, they reflect a proceeding in which the central dispositive question was resolved under the wrong legal framework, without the evidence necessary to answer it correctly, and to the permanent and complete foreclosure of Petitioner's right to equitable relief.

5. To the extent any party seeks to seal these proceedings, Petitioner respectfully submits that no compelling interest exists to overcome the strong presumption of public access. This matter directly implicates Respondent's internal governance practices and its publicly marketed standards for Human Capital Management and Diversity, Equity, and Inclusion. The parties' own Arbitration Agreement explicitly provides that the award is non-confidential and that Petitioner is not required to maintain confidentiality of the proceedings or award. The public retains a well-established common law and First Amendment right of access to judicial dockets in civil proceedings, including those involving civil rights enforcement. *See Stone v. University of Maryland*, 855 F.2d 178, 180 (4th Cir. 1988) (recognizing the common law and First Amendment right of public access to judicial records). Petitioner respectfully requests that this matter and all attached exhibits remain part of the public record.

6. Petitioner further notes that in the underlying arbitration, Respondent requested that Petitioner be ordered to pay Respondent's attorneys' fees and litigation costs. See Respondent's Response to Claimant's Demand and Motion to Dismiss at page 17 (March 6, 2026). The Arbitrator declined to award any fees or costs to either party. Final Award at 3 (June 8, 2026). To the extent Respondent renews any such request in connection with this proceeding, Petitioner respectfully submits that such a request would be without

basis. Under the American Rule, each party bears its own attorneys' fees absent explicit statutory or contractual authorization. The parties' Arbitration Agreement contains no provision authorizing fee-shifting against a claimant, and the employment statutes underlying Petitioner's claims permit a prevailing employer to recover fees only where a claimant's claims are frivolous, unreasonable, or without foundation. Petitioner's claims are grounded in a documented factual record and raise a good-faith legal argument regarding the applicable equitable tolling standard. Respondent's fee request in arbitration was directed at a first-generation Filipino immigrant and a new mother in her 40's, who persevered beyond her upbringing in a family of six that survived on six dollars a day in pursuit of the American Dream - solely because she exercised her statutory right to seek legal redress. This Court should decline to entertain any renewed request for fee-shifting in this proceeding.

## STATEMENT OF FACTS

7. On March 4, 2022, Petitioner and Respondent entered into a Mutual Agreement to Arbitrate (the "Agreement"), governed by the Federal Arbitration Act and administered under the JAMS Employment Arbitration Rules & Procedures. The Agreement provides that "the Arbitrator will apply the substantive law of the State in which the employee works or worked, or federal law, or both, as applicable."

8. On September 16, 2024, Respondent notified Petitioner that her position was being eliminated, effective November 15, 2024. Petitioner's effective termination date was extended through approximately September 9, 2025, due to medical and parental leave during which Respondent's own 60-day transition period was paused.

9. In her Statement of Claim and Opposition to Respondent's Motion to Dismiss, Petitioner alleged that Respondent's offered rationale for her termination changed over time. Management initially attributed her termination to the uncertain future of her program, "Renewal Plays" - an explanation corroborated by former teammates through February 2025, who confirmed the program was slated for elimination as part of an organizational pivot. Given that program dissolution typically unfolds incrementally, Petitioner reasonably accepted this initial justification and possessed no reason to suspect unlawful motive or pretext at that time. Between March and April 2025, Petitioner was informed by a former colleague that "Renewal Plays" had been officially eliminated and that the remaining team had been reassigned to an entirely new program called "Campaigns." This further corroborated the explanation Petitioner had been given for her termination and gave her no additional reason at that time to suspect pretext or discriminatory motive. In approximately May or June 2025, Petitioner received an automated email notification from Venngage — the external platform her team had used to build Renewal Plays program materials, to which Petitioner still had access. Upon logging in, Petitioner discovered that the materials she had created for Renewal Plays were still actively in use under the "Campaigns" label. Petitioner concluded from this discovery that "Campaigns" was not a new program but rather a rebranding of her original Renewal Plays program under a different name, with her work product continuing in active use after her separation. In November 2025, Respondent's in-house counsel attributed Petitioner's termination to a different program entirely — "Play for Points" — which Petitioner never owned and which had been discontinued in May 2024, months before the September 2024 restructure. Respondent's own internal HR investigator referenced "Renewal Plays"

by name throughout an internal investigation. Between December 2025 and February 2026, Respondent posted job openings explicitly requiring execution of "Renewal Plays" responsibilities — the same program Respondent's litigation position claimed had already been eliminated to justify Petitioner's termination, implying Respondent reverted back to the program's original name more than a year after Petitioner's layoff notification. Consequently, Respondent's shifting and deceptive justifications constituted actively misleading conduct regarding the true reasons for Petitioner's termination, which she could not have reasonably discovered within 180 days.

10. Petitioner argued this sequence was material to whether and when she could reasonably have discovered the factual basis for her claims — a question distinct from whether Respondent acted with deliberate design to delay her filing.

11. Critically, Petitioner had no basis to suspect discrimination on September 16, 2024, the date the Arbitrator identified as the triggering event for the limitations period. On that date, Petitioner was given a specific, facially legitimate, and internally consistent explanation for her termination: her program was targeted for elimination as part of a broader restructuring. Petitioner had no access to internal systems, files, or communications that would have allowed her to investigate or contradict the stated rationale — Respondent had removed Petitioner's access to all internal systems except email and chat at the time of the layoff notification. The standard for beginning the limitations period requires not merely knowledge of the adverse action, but knowledge — or reason to know — of facts suggesting the action was discriminatory. A facially legitimate business explanation, corroborated by the simultaneous elimination of the employee's own manager, does not provide that reason. At the time of her layoff

notification, Petitioner did not suspect discrimination. The circumstances felt consistent with a legitimate restructuring. It was not until months later, after a series of discoveries detailed below, that Petitioner first had reason to question the explanation she had been given.

12. During the period between September 16, 2024 and her induced delivery on February 6, 2025 — the precise window during which the 180-day limitations clock was running — Petitioner was managing a convergence of medical, legal, and personal circumstances that rendered independent investigation of her employer's stated rationale practically impossible for any reasonably diligent person in her position. Specifically:

(a) Petitioner's pregnancy was high-risk from the outset due to three compounding factors: advanced maternal age at first pregnancy, the pregnancy having been achieved through IVF, and a family history of pre-eclampsia. These factors required intensive monitoring throughout the pregnancy.

(b) Petitioner was placed on mental health disability leave effective September 29, 2024, following a referral from her OB-GYN who documented severe stress, high anxiety, and pregnancy-related complications directly linked to the sudden loss of employment. Petitioner was enrolled in perinatal mental health therapy with (REDACTED Mental Health Clinic in maternal mental health) beginning November 2024, to which she was referred by her OB-GYN due to the mental health toll of the layoff.

(c) Petitioner's short-term disability leave required renewal and re-certification through Respondent's third-party leave vendor, Sedgwick, approximately every

six weeks, with no guarantee of approval at each renewal interval. This created ongoing uncertainty about her income and benefits during the same period the limitations clock was running, requiring Petitioner's attention and energy to maintain continuous coverage.

(d) Petitioner developed gestational diabetes in November 2024, requiring insulin injections and strict glucose monitoring four times daily, dietary reporting to a nurse, and coordination with Maternal Fetal Medicine specialists. Petitioner attended forty-six medical appointments between September 2024 and her delivery.

(e) Simultaneously, Petitioner was the sole financial sponsor of her mother's pending U.S. immigration application. Petitioner's continued employment was a required condition of that sponsorship. In late December 2024, Petitioner learned that her mother's consular interview at the U.S. Embassy in Manila had been scheduled for February 2025 — the same month as Petitioner's due date — and that proof of continued employment would be required at that interview. Petitioner had no immediate family support in the United States other than her husband and in-laws, her mother being unable to travel to the U.S. until the immigration process was resolved.

(f) Petitioner delivered her son on February 6, 2025, induced two weeks early due to insulin intolerance, and entered postpartum recovery while simultaneously navigating newborn care without the support of her immediate family.

13. Petitioner's first basis for suspecting discrimination did not arise until May 2025, when she discovered through LinkedIn that a similarly situated white colleague under 40 years of age, who had also been included in the same layoff while pregnant, had received materially different maternity leave treatment — a fact that by its nature could not have been known to Petitioner in September 2024 because it had not yet occurred. It was only after this discovery, and the subsequent receipt of an automated notification from Venngage (the platform used to build Renewal Plays program materials) implying her materials were still actively in use, that Petitioner began to question the explanation she had been given for her termination.

14. On June 8, 2026, the Arbitrator entered an Order granting Respondent's Motion to Dismiss, addressing and rejecting Petitioner's continuing-violation theory but not addressing, by name or substance, Petitioner's separate discovery-based equitable tolling argument.

15. On June 11, 2026, Petitioner filed an Application for Clarification, asking the Arbitrator to clarify whether this argument was considered and rejected, considered and found legally insufficient, or not reached.

16. On or about June 20, 2026, the Arbitrator entered an Order on Petitioner's Application, stating that Petitioner's argument "was considered and rejected as unsupported by case law." (Suppl. Order at 2.) The Arbitrator applied the standard from *Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982), holding that equitable tolling requires a showing that Respondent engaged in "a deliberate design" to delay Petitioner's filing, or took actions Respondent "should unmistakably have understood would cause [Petitioner]

to delay filing." (Id.) The Arbitrator concluded that "the sequence of events identified by Claimant," even if factually supported, did not meet this standard. (Id. at 2.)

17. The standard applied by the Arbitrator — derived from *Price* and from *Huff v. Board of Governors of University of North Carolina*, 334 F. App'x 583 (4th Cir. 2009) — governs equitable estoppel: tolling based on an employer's affirmative misconduct intended to or understood to cause delay. Petitioner's argument, as presented in her Statement of Claims and Opposition, was not that Respondent intended to delay her filing, but that she could not have discovered the factual basis for her claims earlier because the explanation for her termination was inconsistent and contradicted by Respondent's own internal communications and subsequent conduct — a discovery-rule theory of equitable tolling, analytically distinct from estoppel.

**THE PUBLIC INTEREST AND MATERIAL ESG CONTRADICTIONS**

18. Respondent Cisco Systems, Inc. publicly promotes itself as a global leader in corporate sustainability, including on Environmental, Social, and Governance (ESG) indices, and has publicly championed comprehensive Diversity, Equity, and Inclusion (DEI) values, including at its December 2025 shareholder meeting where shareholders voted 99 to 1 against a proposal to scale back those commitments.

19. The factual record detailed herein reflects shifting and internally inconsistent explanations provided by Respondent for Petitioner's termination between September 2024 and December 2025 — explanations Petitioner contends are directly relevant to the timeliness question at the heart of this proceeding and that remain unaddressed under the applicable legal standard.

20. Respondent's use of mandatory private arbitration agreements, which preclude judicial review of discrimination claims on their merits, weighs against sealing any portion of this record and raises questions of transparency regarding Human Capital Management practices affecting pregnant and protected-class employees.

21. Because the underlying JAMS arbitration award is explicitly non-confidential under the parties' own Arbitration Agreement — which provides that proceedings "will be kept confidential only with [Petitioner's] agreement" and that Petitioner "will not be required to maintain the confidentiality of the arbitration proceeding or award" — the public interest and principles of transparent corporate governance support keeping this matter and all attached exhibits open and available for public and investor scrutiny on the judicial docket.

## ARGUMENT

### I. The Arbitrator exceeded her powers under 9 U.S.C. § 10(a)(4) by applying an inapplicable legal standard to Petitioner's properly raised and controlling argument.

22. The parties' Agreement strictly required the Arbitrator to apply "applicable substantive law." While an arbitrator's mere legal error or misinterpretation is insulated from judicial review, an arbitrator exceeds her authority under 9 U.S.C. § 10(a)(4) and deprives a party of a fundamental right to a hearing under 9 U.S.C. § 10(a)(3) where she purports to apply the governing law but instead applies an inapplicable standard that completely forecloses a party's right to present material evidence.

23. The Arbitrator's June 20, 2026 Order analyzes only whether Respondent engaged in deliberate, intentional conduct designed to delay Petitioner's filing. It does not address whether Petitioner could have reasonably discovered the factual basis for her claims earlier than she did, given the documented inconsistencies in Respondent's stated rationale for her termination and the extraordinary personal, medical, and legal circumstances detailed in Paragraphs 11 and 12 above that made independent investigation during the limitations period practically impossible.

24. Courts applying equitable tolling and equitable estoppel doctrines have long recognized that an employer's misleading or inconsistent explanation for an adverse action can independently support tolling, separate from any showing of deliberate intent to delay. In Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1391–92 (3d Cir. 1994), the Third Circuit held that allegations that an employer actively misled a plaintiff regarding the reason for her discharge, and that the critical fact supporting her discrimination claim only became known to her much later, were sufficient to invoke equitable tolling, notwithstanding that the plaintiff possessed the underlying facts of her termination from the date it occurred. Similarly, in Rhodes v. Guiberson Oil Tools Division, 927 F.2d 876, 880–82 (5th Cir. 1991), the Fifth Circuit held that the filing period was tolled under equitable estoppel until the plaintiff discovered the falsity of his employer's stated reason for his termination, clarifying that estoppel "does not hinge on intentional misconduct on the defendant's part," but turns on "whether the defendant's conduct, innocent or not, reasonably induced the plaintiff not to file suit within the limitations period." Although neither decision is controlling in this Circuit, both illustrate that the "deliberate design" standard applied in the Arbitrator's Order is not the only

recognized basis for tolling arising from an employer's inconsistent explanations, and that the discovery-based theory Petitioner raised was a distinct and recognized legal argument the Order did not address.

25. Because the Arbitrator's stated basis for rejecting Petitioner's argument addresses a different legal question than the one presented, the Order does not reflect a reasoned application of the controlling law to Petitioner's claim, and instead reflects the application of an inapplicable legal framework, exceeding the scope of the Arbitrator's authority under the Agreement.

**II. In the alternative, the award should be vacated for manifest disregard of the law.**

26. The Fourth Circuit has recognized manifest disregard of the law as a ground for vacatur, either as an independent basis or as a judicial gloss on the enumerated grounds of 9 U.S.C. § 10(a). See Raymond James Fin. Servs., Inc. v. Bishop, 596 F.3d 183, 193 n.13 (4th Cir. 2010); Warfield v. ICON Advisers, Inc., 26 F.4th 666 (4th Cir. 2022). To establish manifest disregard, a petitioner must show that the arbitrator was aware of a governing legal principle, that the principle was well-defined and clearly applicable, and that the arbitrator nonetheless refused to apply it.

27. The governing legal principle at issue here is the discovery-rule theory of equitable tolling — the principle that a limitations period does not begin to run until the claimant knows or reasonably should have known the factual basis for her claim. This principle is well-established in federal law and was squarely presented to the Arbitrator in Petitioner's Statement of Claims and Opposition to Respondent's Motion to Dismiss.

28. The Arbitrator's June 20, 2026 Order demonstrates awareness of the equitable tolling framework — she addressed the tolling question directly and cited controlling Fourth Circuit authority. However, rather than applying the discovery-rule standard to Petitioner's documented facts, the Arbitrator substituted the deliberate-design standard applicable to equitable estoppel, a related but analytically distinct doctrine. The substitution was not a mere misapplication of law; the Order explicitly analyzed whether Respondent acted with deliberate design, while entirely ignoring the operative, distinct question of whether Petitioner could reasonably have discovered the factual basis of her claim given the circumstances detailed in Paragraphs 11 and 12 of this Petition.

29. The June 5, 2026 Order further states that "no amount of discovery will change the dates these discrete events occurred." (Order at 10–11.) In making this declaration, the Arbitrator did not make an inadvertent legal error or miscalculate a timeline. Rather, by framing the timeliness question exclusively around the fixed dates of the adverse employment actions, she consciously applied a framework that asks only when the acts occurred — not when a reasonably diligent person in Petitioner's documented circumstances could have discovered their discriminatory nature. The discovery-rule theory of equitable tolling is well-defined, was squarely presented, and exists precisely to pause the 180-day window in circumstances where the latter question yields a different answer than the former. An arbitrator who acknowledges the tolling question, cites controlling authority on it, and then applies an alternate framework that forecloses discovery-rule relief entirely has consciously disregarded the applicable law, satisfying the standard for manifest disregard.

30. Furthermore, by declaring that no amount of discovery could affect the timeliness outcome, the Arbitrator effectively refused to consider material and pertinent evidence bearing on the accrual question — specifically, evidence regarding when Petitioner first had reason to know the factual basis for her claims, including the shifting program-name explanations, the Campaigns rebranding, and the subsequent Renewal Plays job postings. This conscious disregard resulted in a dispositive dismissal to the complete exclusion of the framework actually governing the question presented, and constitutes a refusal to hear evidence pertinent and material to the controversy within the meaning of 9 U.S.C. § 10(a)(3), independently warranting vacatur.

**III. The Arbitrator Denied Petitioner a Fundamentally Fair Hearing and Violated 9 U.S.C.§ 10(a)(3) By Granting a Pre-Discovery Dismissal and Refusing to Hear Material Evidence**

31. Under 9 U.S.C. § 10(a)(3), a reviewing court may vacate an arbitration award where the arbitrator is guilty of misconduct "in refusing to postpone the hearing… or in refusing to hear evidence pertinent and material to the controversy." While arbitrators enjoy broad discretion in regulating the admission of evidence, that discretion is limited by the fundamental requirement of due process: a party must be given a full and fair opportunity to present their case. Exclusion of evidence rises to the level of misconduct under § 10(a)(3) where the excluded evidence was material to the controversy and its exclusion caused substantial prejudice to the party seeking to present it.

32. A pre-discovery summary dismissal that completely forecloses a party's ability to develop an evidentiary record on a fact-intensive, dispositive issue constitutes a refusal to hear material evidence under § 10(a)(3). To establish a violation of § 10(a)(3), a petitioner must demonstrate that the excluded evidence was material, and that its

exclusion deprived the petitioner of a fundamentally fair hearing resulting in substantial prejudice. Both elements are satisfied here, where the dismissal was with prejudice and foreclosed any further opportunity to develop the factual record on the central dispositive question.

33. The evidence Petitioner sought to develop through discovery was highly pertinent and material to the threshold question of timeliness. Specifically, Petitioner's claims regarding Respondent's shifting justifications, the active use of her proprietary work product on the Venngage platform under a rebranded "Campaigns" label, and the subsequent job postings for her exact role were material to establishing when the claims legally accrued under the discovery rule. Furthermore, the extensive medical records documenting Petitioner's high-risk IVF pregnancy, gestational diabetes, and forty-six medical appointments were material to establishing the extraordinary circumstances relevant to equitable tolling. Discovery would have permitted Petitioner to develop and present this evidence in support of the accrual question — a question the Arbitrator resolved without it.

34. By granting Respondent's Motion to Dismiss prior to the exchange of discovery, and explicitly declaring in the June 5, 2026 Order that "no amount of discovery will change the dates these discrete events occurred" (Order at 10–11), the Arbitrator did not merely limit cumulative or tangential evidence. Rather, the Arbitrator erected an absolute procedural barrier that effectively refused to hear any evidence regarding the equitable alignment of those dates under the discovery rule. Because the operation of equitable tolling and the discovery rule turn entirely on fact-intensive inquiries into what the claimant knew and when she knew it, the Arbitrator's pre-discovery dismissal completely

stripped Petitioner of the opportunity to build a factual record on the central dispositive question, resulting in a denial of a full and fair hearing that warrants vacatur under 9 U.S.C. § 10(a)(3).

## RELIEF REQUESTED

WHEREFORE, Petitioner respectfully requests that this Court:

A. Vacate the Final Award and remand this matter to the Arbitrator, or her successor if she is unavailable under the JAMS Rules, with instructions to evaluate Petitioner's equitable tolling argument under the discovery-rule standard actually presented, including consideration of the circumstances detailed in Paragraphs 11 and 12 of this Petition; or, in the alternative,

B. Remand for clarification of the Order and Final Award without vacatur of the remainder of the Award;

C. Award Petitioner the costs of this proceeding; and

D. Grant such further relief as the Court deems just and proper.

## STATEMENT REGARDING PUBLIC ACCESS

35. The parties' Arbitration Agreement provides that arbitration proceedings "will be kept confidential only with [Petitioner's] agreement," and that Petitioner "will not be required to maintain the confidentiality of the arbitration proceeding or award." Petitioner has not agreed to confidentiality and respectfully requests that this matter and all attached exhibits remain part of the public record, consistent with the strong presumption of public

access to judicial proceedings recognized in *Stone v. University of Maryland*, 855 F.2d 178 (4th Cir. 1988).

Respectfully submitted,

______________________

Criselda Angela Bell

Petitioner, Pro Se

1232 Harp St. Raleigh NC 27604

criselda.monteza@gmail.com

919-985-228

Dated: Aug 7, 2026

**CERTIFICATE OF SERVICE**

I certify that on this 7 day of Aug, 2026, a true and correct copy of the foregoing Petition was served upon Respondent Cisco Systems, Inc. via process server, as set forth in the accompanying Affidavit of Service.

______________________

Criselda Angela Bell